We have before us the case of Blackledge, Charles W. Blackledge v. Olga, 16-3667, Mr. Yingling, and Ms. Emsberger. I think we're going to have some feedback possibly, so we'll have to deal with that. Whenever you're ready. May it please the court, Patrick Yingling for the appellant Charles Blackledge. With the court's permission, I would like to reserve three minutes for rebuttal. That's fine. The Hague Convention is designed to restore the factual status quo when one parent unilaterally detains a child in a country to which the Here, Mr. Blackledge petitioned for the return of his only child, JB, to Germany. We've got all the facts here. This is a dumb question. Essentially, we're talking here about the venue that ultimately decides this issue. Is it going to be the United States or Germany? And this case has a fair amount of irony in that the U.S. citizen is asking for Germany, and the non-U.S. citizen, or at least I think non-U.S. citizen, is asking for the United States. I take it there's a perception that if this is decided in Pittsburgh that you're not going to get a fair shake? That's not necessarily a perception, Your Honor, and it's in fact my understanding that in Germany the standard is similar. In custody situations, the best interest of the child, kinder, or child wellness in some way. I think Mr. Blackledge wants the return of his child in the immediate term, and he would prefer because he lives in Germany that a German court decide this custody situation, and that's why he's petitioned here under the Hague Convention. But putting aside the parent's preferences, as you said at the outset, the Hague Convention is designed to maintain the status quo. So at the date of the retention, and we can talk about the specifics of what that date is, but at the time of the alleged wrongful retention, J.B. had spent a year in Pittsburgh. As I understand the record, that was actually his second year in Germany. He returned for his third year. In the course of litigation and the slow wheels of justice, it's now been almost a fourth year. So of the last six years, if I understand it correctly, he spent the last four of those in Pittsburgh. Why under those circumstances wouldn't it be the antithesis of that purpose, that is, removing him from the two parents and two pedigrees, while he continued to reside in Pittsburgh, where he's now spent four years? Before you answer, I wonder if we sit back just a tad from the mics. That might help. I'm not sure. Your Honor, I think the status quo has to take into account that the parties here had an agreement for J.B. to go to the United States, to leave his habitual residence in Germany and stay in the United States for a specific limited period of time, and that was one academic year. And that's important here, because when we look at the habitual residence, a habitual residence must be effectively abandoned before a child can acquire a new habitual residence. And if we look at both the parent's shared intent and the child's acquisition, and the shared intent is important because in a number of cases, if the part of the shared intent for the child to be at the new location for only a specific limited period of time, that will color the child's outlook on his contacts in the new environment. As this Court stated in Karkanen, the intentions of a child's parents affect the length of time necessary for a child to become habitually resident, because the child's knowledge of these intentions is likely to color its attitude to the contacts it is making. But that's only the first part of the analysis, isn't it? Isn't it? And that's to say, well, we have different legal tests that seem to come into play, depending on how you handle the facts that are presented. So Mr. Court looked at this as no time indefinite duration, and as a result, this might easily change to a new habitual residence. There are cases that say where it's a specific limited duration without a degree of settled expectation that in that situation, typically, there's not a change of residence. But there's also our case law in Whiting, which we had asked parties to be prepared to address, the Ninth Circuit's approach in Venezuela, and a host of international courts uniformly taking the position that where there is alternating residences between parents who have decided that they're going to have essentially two permanent caregivers, and they're going to sequence their time with the child, that constitutes alternating habitual residences, and the child's a habitual resident of whichever of those parents he or she is in during that scheduled period, as they alternate back and forth. Why isn't that this case? Your Honor, I'm happy to address the alternating habitual residences. I will just first say factors that come together. When we look at a change in habitual residence, we ask whether the previous residence has been effectively abandoned. Then to decide that, we look at the shared intent of the parties and the acquisition and how they interact. But what we recognize in Whiting is to abandonment. I take your point. Right. We said in Whiting that that's essentially the flip side of a temporary move, a move of limited duration that nonetheless carries a degree of settled purpose. That is, that you're actually putting down roots. You're living a full life during that limited period that necessarily that's accompanied by an abandonment of the other for the same limited period. So those are flip sides of the same coin. Your Honor, it's our position that alternating habitual residences, as the Ninth Circuit discussed in Valenzuela, cannot apply here. And that's because I'll just first initially say that the Court has never recognized as valid the alternating habitual residences exception to the rule articulated in Yang from 2007 that a child's habitual residence has to be effectively abandoned before he can obtain a new habitual residence. Well, isn't that exactly what we said in Whiting, where there was a move for a temporary period? That was only that the intent had been, you know, of a move for a longer period. But the father there brought the child back from Canada to the United States with the expectation he'd been staying in Canada for a two-year period. Right? Right. And the father brought the child back after only two months. And nonetheless, we said that because the shared intent was that there would be a temporary move for two years, but during those two years that the mother and child would be fully living their lives in Canada. Right. That Canada, within even that short two-month period, because of the shared intent of the parents, had become the habitual residence, notwithstanding the idea that there was going to be this altering coming from the U.S. to Canada for two years and back to the U.S. Your Honor, I think the court placed specific emphasis in Whiting on the circumstances of that case where the child was an infant. We were dealing with an 18-year-old child. There was an agreement to go to Canada for a two-year period. And then the court found that that was significant enough, given the child's young age, given the circumstances, for it to effectively abandon the prior habitual residence. But Whiting is actually a unique case in that regard, because as this court recognized in Karkanen, in most situations where there is a specific shared intent for the parties for the child to go to the new location for a specific limited period of time, there's not going to be a change in habitual residence. And that that change will only occur in unique circumstances, like in Whiting, or like in Karkanen, where the parents had a shared intent for the child to make that decision on her own after the summer. Doesn't that cut the other way? If you're talking about a child who's an infant, so you can't actually take account of the child's own development of relationships, the child's own preferences. So in Whiting, we were left to really look to the shared intent of the parents. And where we were focused on that shared intent, putting aside the evidence of acclimatization from the child's perspective, we nonetheless said where the parent's shared intent was for one parent with child to move for a two-year period, and to truly settle into life, the normal course of life for that two-year period, that the abduction by the habitual residence, in this case where we have a child who is of sufficient aging maturity to actually form relationships, to develop a normal routine, a sense of environmental normalcy, as we discussed in Whiting, don't we have even more reason to consider the place that the parents intended to move, to move for even a limited duration, but for putting down roots for that period as a habitual residence? I think the child's age in this circumstance is significant because he was old enough to be aware that his stay in the United States was going to be for a specific limited period of time, and he recognized that, too. He stated that to the district court judge, that he was aware that he was told he would only be in the United States for a limited period of time, but that his mother now wanted him to stay for another year. And I think that it was a clear error on the part of the district court to conclude that there was no specific intent to stay for a certain period of time, because the record shows that both of the parties signed an agreement with J.B.'s school in Germany, this can be found at J.A. 97, requesting a one-year leave of absence from J.B.'s school, and declared on that document that J.B. will return to JFK for the academic year 2016-2017. And then, this is corroborated by the fact that in their email exchanges later, Mrs. Blackledge repeatedly acknowledged the agreement and asked for reconsideration of the agreement. She states, Chuck, I think you misunderstand me. I'm not breaking the agreement. I'm suggesting to reconsider it. And then in the subsequent email, Chuck, you're not hearing me again. I'm not breaking the agreement. It should be reconsidered. And then again, Chuck, I think you should think about reconsideration of the agreement. And one more time, dear Chuck, you have all my sympathy, but please prepare yourself to reconsider the agreement. The district court found that there was no shared intent to stay in the United States for a specific limited period of time, because the email exchanges did not refute Mother's position that they could have been there until she finished her Ph.D. But I submit to the court that Mother would not have needed to reconsider the agreement if that was the case, and that's why we have a clear error here. I'm sorry. As to the nature of that agreement, let's say we agree with you that it was not of an indefinite duration and that there was an agreement of a return to go for a year or so and to go back to Germany. You're not arguing that the return to Germany was intended to be a permanent return. But the agreement is reflected repeatedly in these emails seems to be that there would be alternating residence. Your Honor, I think that's incorrect. I don't think the agreement was for alternating residences. What we have here is a family that had an established life in Germany. Mother made a decision that she needed to return to Pittsburgh to finish her degree, and Father gave limited consent for her to return with J.B. for that period of time, and after one academic year returned to the United States. This is not a situation as in shuttle custody cases where you find alternating habitual residences where there is, and as the court in Valenzuela said, shuttle custody only occurs where parent one and parent two agree to split custody between two countries, shuttling the children between the countries on a regular basis. There was no preexisting agreement here to say that J.B. will go to Germany for a period of time and the United States for a period of time. They were in Germany, no definite plans to change that, and then Mother went to the United States with J.B. with Father's limited consent for that period of time, and that's what's relevant here. Is the Father currently today working in Germany? Yes, that's correct, Your Honor. What do we make, if that's the case, what do we make of these emails, for example, from the Mother talking about, I don't think it's a good idea for a child J.B.'s age to live with one parent for a year and with the other parent for a year. If you could live somewhere close so we could both take care of J.B. on a permanent basis, I really don't think it's in J.B.'s interest to change permanent caregivers every year. And the Father responds talking about, I agree to go with you to Pitt in August on the condition you return for the year in Berlin 2016 to 2017. You did not mention your concern it would be bad for J.B. to spend alternate years with us when the agreement was made. The only agreement I'm aware of is J.B. would go with you to Pitt, return to me for 2016-2017, then back to you. And in other emails he'll return to me for 2016-2017, you'll have him again in 2017. Right. If you were asking us to set aside the district court's fact finding that there was not an agreement of a specific limited duration and to instead ascertain the nature of the agreement from the record, doesn't this record say in black and white that this was an agreement that in effect continued the alternating residences that he had had in Pittsburgh and then in Germany and then back to Pittsburgh and then, as the Father has said explicitly, back to Germany for one year and then back to Pittsburgh for the following year? Why isn't this a paradigm of alternating habitual residences? I think that when we look at those alternating habitual residences in the shuttle custody cases, those were situations in which the agreement from the beginning was to do this back and forth. And I think we can look back in time here and say that J.B. spent over the past five years an equal amount of time in each of those countries, but that the returning to the United States at a later time was Father's attempt to get Mother, Mrs. Blackledge, to uphold her agreement and get J.B. back to Germany pursuant to their agreement, which was the basis for him allowing J.B. to go back to the United States to begin with. I think that it's important that while they were in Germany, there was no, and I don't believe this is contested, there was no definite plan that they were going to change their decision while they were in Germany as a family that she needed to go back to Pittsburgh at that time. But again, the e-mails and the mother's testimony don't reflect that. She testified that the return, even in going back to Germany for two years, that was with the understanding of returning after that back to Pittsburgh. And the district court made a credibility finding and found the mother's testimony more credible. How could we second-guess that as to the nature of the expectations that they had in terms of a return to the United States? I think it's important to look at the shared intent, and that's the standard here. We have Mother giving certain testimony post-dispute as to her understanding of the agreement and what it may have been. But I submit that that comes nowhere close to outweighing the pre-dispute evidence in the record that the parties intended for in the one-year legal absence document stated that J.B. will return to Germany for the academic year 2016-2017, and these e-mails which corroborate the fact that that was the agreement in place at the time. I see I'm out of time. We'll add on three more minutes if you want to, please, Susan. If it's possible, I'd like to address our second point for reversal here, and that has to do with the retention date error. In a Hague Convention case, the retention date determination is the first step in the analysis in determining whether the left-behind parent has laid out a prima facie case. The wrongfulness of the retention cannot be determined until that retention date is fixed. Everything revolves around that retention date. And the retention date, according to this court's precedence, is determined solely based on when the non-custodial parent clearly communicates his desire to regain custody and asserts his parental right to have his child live with him. We didn't actually hold that. In fact, we were explicit that we were not necessarily adopting that. That's a northern district of, I believe, Illinois case that we quoted, and then we found that there had been clear error in the retention date in Karkainen. You seem to be asking us to use the date of June 9th. That is the date that the father made a demand for a future return date. How could that, the date of the demand itself, be the wrongful retention date? Would you say that if there were agreement, for example, for a two-year stay in a country and, you know, one month into it, say in January of year one, the parent says, I don't want it to be two years. I want it to be one year. I'd like to have the child back in December, that we would say January of year one there was a wrongful retention? First of all, Your Honor, with respect to that being the standard, I think if we look at Karkainen and Yang and look at the district court here and how it based its analysis, they've used the standard of clearly communicated. But I want to address your hypothetical as well. Let's say there was an agreement for a two-year stay and then the left-behind parent decides after a shorter time period, nope, I want the child back. I'm making my demand. That would still be the retention date when that left-behind parent makes that demand, but that doesn't ultimately, in that case, it's very unlikely that the left-behind parent would prevail because there are affirmative defenses here. There are consent to have the child live in that other location that the respondent could then say. Let's just get down to specifics. Didn't the father agree that J.B. could attend summer camps during the summer of 2016? He did not. They take the position that he acquiesced to that, which is a consideration that goes to affirmative defenses. That sounds like he's agreed to it. It sounds like the district court isn't wrong in saying it's August. Here, Your Honor, I think that the record shows that he, in fact, did not acquiesce to that anyway and did not give his consent for that purpose, but I also think that that consideration is not relevant at all to the retention date determination because that's a consideration that goes to affirmative defenses. Of course, looking as to when the mother refused to return him, it looks like that could be August. Could it not? How can I say that's clearly erroneous? Well, because on the same day that father sent his e-mail on June 9, mother replied and says, I'm not going to return him. You can come to Pittsburgh if you want and spend time with him, and that's where the line was drawn on the stand and that's where we think the retention date should be determined here. There continues to be back and forth before there's any date specific. Even in Karkanen, we didn't say that the parent's date of demand was the date of return. We looked at the actual date that there was a purchase of the airline ticket had been purchased. That is, the flight was scheduled on that day. The child didn't get on the flight. We treated that as the retention date. I mean, if anything, wouldn't that analogy go to June 19, not June 6? Your Honor, fair enough in that circumstance. We still submit that the standard that this Court has talked about in Karkanen looks at the date. It's clearly communicated, but even if it's June 19, I don't think that alters the analysis or position at all that the district court incorrectly determined the retention date and that it relied on irrelevant evidence because of that determination. And I think that the district court's misapplication of the law here is especially evident because it decided the retention date was even after father filed the petition on July 6. We're aware of no case where that's ever been done before. Thank you. Do you have any questions? I'm sorry. I have none. Thank you. Judge Ambrose? Yes, sir. Are you still getting a little feedback? No, I am not. Are you? No, I'm not. It seems to be working out okay. Because I was just wondering if you get feedback from my speaker here, I can put it on mute until I have a question. Okay. Maybe that's what's working right now, but when you want to jump in, just jump in. Very well. Good afternoon, Your Honors. I represent the athlete Olga Blackledge in this matter. Based on the first question asked by the court opposing counsel, there is a custody action in Allegheny County. There's a full custody trial scheduled for July of this year, a two-day trial. Both parties are appearing pro se. So that is scheduled for this summer. There was a custody order last summer, and that was an interim order by the Court of Common Pleas, Judge Bubash, that granted interim custody to father for the summertime. And so mother, in conformance with that order, emailed father about the summer camps and summer activities of the child in advance, and he acquiesced. She paid for them, and he acquiesced, and the child was in swimming camp, which he'd been all year. Continuation of activity began in the fall. And he was also, I think he did a robotics camp. So all of that was agreed to by father. He did not come to me. You've asked us to look to the end of August. That would mean that that was after the complaint was filed, even after the district court here had ruled about a retention that then purportedly had yet to happen. If that were true, then this case wouldn't even have been right. I mean, we wouldn't have jurisdiction to decide this case. If there had not been a wrongful retention, would we? I thought my retention date was August 1st, which is the year from the mother came here, August 1, 2005. Mother and child came here August 1, 2015. I went with August 1st of 2016. If it got misstated somewhere, I apologize. But that was the construct that I thought fit the factual situation of these parties. You know, Karkina, if nothing else, tells us that a parent can withdraw permission, right, can withdraw consent, and by his doing so can accelerate the retention date. Would you agree with that? I agree with it, but it didn't happen in this case because he, father, agreed to have the child essentially attend all the summer activities, which was a continuation of what he had been doing all year. And if he had not wanted, he could have said, I don't want the child in any of those activities. He did not do so. He was essentially agreeing. And, of course, the child would have been told, oh, you're going to be doing all of this by his mother and maybe also by his father. So he knew that he was going to be there attending those activities. So I think that father essentially extended his, I don't know, muddied the water, I don't know what the right word would be, but he was not clear in making a demand for return. But surely by the time he filed his complaint, right, that withdrawal of consent and an affirmative expression of his desire for JB to return. I understand that's only a few weeks. I think it's two and a half weeks different from when my August 1st date. If we conclude that it was an earlier date and there's other evidence regarding the summer that appears in a couple of contexts in the district court's opinion, would we then need to remand for the district court to reconsider what the record would support in terms of acclimatization up to the retention date? Or is it your position that because it relates to only a small part of the record, it could be deemed harmless error? Well, we presented nine witnesses at trial in addition to the party, both parties, and also the child himself in camera examination, which talked about all of his activities through the year. The teacher, his coaches, the robotics competition he was in that his team won first in the state. All of those activities we presented. So the bulk of what he did was presented to the court. And what happened during the summertime was a continuation of those activities. Essentially, he joined a swim team in the fall, and it had several segments. It went all through the year. The swim coach was wonderful how he improved, one of his best swimmers, and he continued all through the year. The robotics camp was because he had done his robotics competition with classmates of his. One of the school mothers took him into a competition that they won, and he had had this wonderful experience. By the way, we have made that video as an exhibit in this case of the competition. But anyhow, so what I'm trying to say is the bulk of all the information about his life came in, and I think the difference between the day of filing the complaint and August 1st is a very limited period of time. Essentially nothing different happened in that period of time to offset anything. Could I just get some facts out? When the mother came to the United States to finish up her Ph.D. at Pittsburgh, has she completed it? Has she completed it as of today? Yes. No, she's still in the program. She was supposed to come for a year. She's not been here two years, and she still hasn't completed it? Yeah, but if you recall, there is testimony from another graduate student, Olga Kim, who came at the same time she did in the same program, and she hadn't completed either as of the date of our hearing. But I would point out that having been involved in all this court activity, the Senate has been a drain on her time. How long does she intend to stay in Pittsburgh? Well, at least until the completion of the Ph.D. I don't know what her employment will be beyond that. And when do you end? It wasn't anticipated it would be one year. It's now been two. What's the current anticipation? Well, she has signed up for another year. I'm not sure when that's all going to happen. She's going to have to prepare and do a custody trial in July, which she doesn't know how to do, and that's going to be a drain on her ability to complete a Ph.D. The long-term goal is to – And just to make sure I get the fact, she's not a citizen currently, is that correct? She has a green card and permanent resident status. Okay. Right. That's what she has. Let me ask you a legal question. Yes. What controls? Parental intent or evidence that the child is acclimated? To determine that issue, and this is my conclusion on that, I think you have to look to the age of the child. If it's a very young child, it's going to be parental intent. When the child becomes older and can develop his or her own attachments to a community, then I think the attachments of the child will become controlled. So you've got a child who was 8 when this started. He's almost 9 now. Excuse me. How much deference do you give to an 8-year-old versus a 13- or 14-year-old? That's almost a question for a psychologist that would be hard for me to answer. I don't mean to put you off, but I really think that's – I do know that if you do things with a 13- or 14-year-old, if they get a custody order that – I do family law. If they don't care for it, they have to disappear. That's less – you know, they run off to a friend's house, they have to be found.  I'm just trying to think back to when I was 8, and I did move when I was 8 for three months. And after three months, I didn't want to move back. But then after I moved back, I was okay after one month. And so it seems that an 8-year-old is probably significantly more flexible than a 13- or 14-year-old. And I realize what I just said is not in the record. Yeah, I know. And I don't necessarily know if I agree. I want to point out something about this family. The parents met in – I think it was University of, say, Oklahoma or Oklahoma State. Father was teaching. Mother was a Fulbright scholar. She returned to the Ukraine because her time was ended. He followed her there. They got married, had a child. When the child was born, the father got on the train and car came and went to Kiev and got an American passport  But this family had, since the beginning, the desire for this child to be an American citizen and to be the U.S. No, I understood. English is their spoken language at home, although mothers are native Russian speakers. Can you have dual citizenship? I can't have dual citizenship with. Can you be German? In the United States, no. You cannot. But he cannot be German. No, he cannot. If it is parental intent, Mr. Gangling cited a number of instances in the record, and I can come up with more. Altogether, I found about seven. It appears to be pretty clear that she's saying there was an intent at one point to return him to Germany. In fact, the intent still existed at that time, but she wanted her husband to reconsider. Yes, there was an agreement, but you're not taking his interests into account. This needs to be looked at again, and that's the theme. And if that's the intent, how do I get around that, especially if we're not sure at eight how much the child's wishes can trump the parental intent? Well, I think you get around it in several ways, one of which it's really not clear in the record, and the trial court found it to be equivocal. The trial court also found mother to have more credibility. I don't understand how it can possibly be equivocal. In addition to the seven, I'll give you an eighth. On June 29th of 2015, the mother signed a letter to J.B.'s school in Berlin, the JFK school, requesting a year of absence while he was in the United States, but he will return to JFK for the academic year 2016-2017. How is that not evidence that both parents had a shared intent for him to return to Germany when the mother left with him to go to Pittsburgh for the 2015-2016 year? His mother testified that she was not sure when she'd be done with her Ph.D. Hopefully it would be a year, but it might be longer. There was a possibility of a post-doctorate position in Berlin that she might be able to obtain, and she felt this would be a way to cover all the bases, that if she would be able to come back, that would be available to her son. There's something I want to point out. When you consider his time in Berlin, he was not embedded in German culture. He went to a specialized school for Americans to raise their children in Berlin to return to the American educational system. From my look at the record, he seems to be a pretty well-adjusted child, regardless of where he is. In Germany, he seemed to adapt pretty well, certainly with respect to German sports as opposed to American sports, things like that that are part of acculturation. He follows the Ukrainian soccer team. But what I was going to say, mother has been his primary custodian throughout. She made arrangements when she could not be in Berlin because of her Ph.D. requirements for her mother, his niece, and her nephew to live with their father and make sure the father had the appropriate assistance that he needed for child care. But are you saying, I mean, I come back to this agreement part. I can't understand why there wasn't an agreement for him to return to Germany. And at some point in the summer of 2016, whether it be June or July or August, how do you get around that? And you'll say, yes, that's not what the judge found, but how do you get around that? How do I get around it? She offered the child would like to come and see some friends in Berlin for two weeks and father didn't even respond to that. Father didn't respond. Whenever the issue of long-term child care is presented to father, he punts it to mother. He's willing to do that. And I think the summertime care, he thought, well, mother's got it arranged, I'm going along with it. And he did that. She arranged everything, which she admitted there were all kinds of people that helped out and was very helpful. When she came to the United States the first time, the child came with her, so she was essentially functioning as a single parent with a child that was like two or three years old. I mean, she has always, always, always, when they were in Ireland before that, she was unable to work because of visa problems. She was doing all the child care in the home. I mean, so what I'm saying is she's been the continuous person taking care of the child care all this time. My question to you is relating to all these pieces of evidence that show that she's never denied there was an agreement to return sometime after the school year in 2016. She's asking that the agreement be reconsidered. Circumstances have changed. You're not taking things for his benefit into consideration. But there appears to have been an agreement that she doesn't deny. No, I don't know that I agree with that. Her testimony at length was that she had to talk him into it, that at first he said no, then finally he said she could go, and finally he said, well, yeah, Jay could go. I'll try to get it done in a year. But that it was open-ended because, as her husband well knows, having a Ph.D. himself, there's no, you're never sure when you're really going to get done with that level of activity. It may be over time that the parents' wishes adjust during this period. But when we look back to paired parental intent for whatever value that has in ascertaining the child's perspective, we have here on the record multiple e-mails from the father, from the mother, talking about changing permanent caregivers every year. The father's saying the only agreement I'm aware of is that he'd go with you to Pitt, return to me for the academic year, then back to you, talking about living for a year in Berlin. You'll have him again in 2017. And then the father documents a phone conversation on May 28th, documenting that mother had disagreed with the plan to alternate between Germany and the USA and thought it put too much pressure on J.B. for him to go back and forth. If we disagree with you and think the district court clearly erred in characterizing this as a stay of indefinite duration so that we're looking to the documentary evidence of an agreement, do you still prevail? That is, should we still affirm if we conclude that this involves alternating habitual residences consistent with the approach we took in Whiting and in Venezuela and the host of international law cases that are cited in Venezuela and even in Rebates, which we cited? In that circumstance, isn't that an alternate grounds for us to affirm and for your client to prevail? I honestly didn't see it that way. I felt those cases were about very young children. They're all under the age of four, each of the three that you cited, and that the child's desires and intent or experiences were not going to be part, you know, you were not going to question the child in any of those cases. But that would only make this case stronger, right? And that's the same question I'm asking. What I felt was because of the age of this child, you move on to a child that can make some decisions. He was found to be mature and aware of his situation. The judge cross-examined him in depth, and his statements were confirmed by his actual activities in the other testimony. He was very credible on his own behalf. And what I'm trying to say is that the alternate concept, first of all, are you at all invading the province of, like, the state court to decide custody in that issue? Because it seems like that becomes a custody decision to me, alternate back and forth. I can't even imagine how you'd be in one country, one state for a while, file something that you're unhappy, you know, in the courts regarding the custody. They never get resolved quickly, and then you're off to the next state, and you file something there because that's now where jurisdiction is. How do you deal with that? I can't even imagine. That's the problem with, you know, determining who gets to make the situation. If they're actually going back and forth, maybe if you don't return the person at the end in Germany the following year, then is that, well, it gets complicated. It's only complicated until there has been, within the country of habitual residence, a determination as to international custody. Once that decision is made, that is then binding, correct? I'm not sure, because if you're saying habitual residence switches, are you switching jurisdiction when you do that? But the Hague Convention is, we're not deciding custody. We're deciding where custody is decided, and under the Hague Convention, once custody is decided in any court where the child was habitually resident, that is a decision that is honored among member states of the Hague Convention, correct? It should be, but don't you think there's an argument for forum shopping here? Because say you have two years in one country, and you go to a lawyer, I'm unhappy about all this, but next year I'm supposed to be in this other country, and they go, ha-ha, wait until you're there. We'll look up the law. You might stand a better chance, or maybe you'll just impose more difficulties. It's always possible a court of another country, I suppose, would violate the international treaty obligations of that country, but that seems unlikely, doesn't it? Well, it's more complicated than that. It's enforcement of it becomes an issue, and whether, from the cases I've read, if you send an order over to Germany, is it really going to be implemented? I mean, and how will it be implemented? And how long will it take to be implemented? I mean, I don't think it's not a simplistic system, and you don't know what's going to happen. I think my basic feeling is you've got to have one boss, and if the parties or one of the parties decides that New York should be another country because conditions have changed and now everybody lives somewhere else, then they should make the appropriate approach to the court and say we want to move the jurisdiction where the heck they want to move it to, which is kind of what you do in a state court now. But I'm so used to dealing with problems of moving one child from one township to the next. If you go outside the school district, you have a real problem on your hands, and that's with having the two different countries and different cultures. I'm just going to ask Judge Nygaard, do you have any questions? Do I have any questions? No, Judge Nygaard, he's there. I do not. Thank you. All right. Anything further? All right, thank you. Thank you very much. I'll try to be brief, Your Honor. Mr. Newman, can you address the question of harmless error? Yes, absolutely. Let's say we think that the retention date should be accelerated. It appears that even if we take one of your earlier dates, there are really only a couple pieces of evidence in the supposed litany of irrelevant facts. On page 25 of your brief, the only things that are in the summer and not during the school year are the birthday party, and the date of that really is not clear. It may even have been before, for example, June 19th. And summer camps, although, again, expectation and excitement that predated the summer would seem relevant to that conversation. With those descriptions of evidence being known as ones that are in the summer, on which the district courts may have relied, why wouldn't you be able to treat that as harmless error if you otherwise agreed for the court to affirm it? I don't think we can apply harmless error here, Your Honor, because I don't think the situation that we have here, the court's opinion, we can't couple the relevant evidence and the irrelevant evidence and make the determination that the district court would have reached the same decision had it only considered this relevant evidence here. And I think that's fundamental in harmless error jurisprudence and why we can't apply it here. I just want to make one brief other point. We talked about shared intent. The effect of that shared intent to stay for a limited period of time is significant, and I think that it's shown best by the Ninth Circuit's decision in Moses written by Judge Kaczynski where a family had a life in Israel. Father gave limited consent for the mother to take the children to Los Angeles for 15 months. After one year, mother filed for divorce and refused to return the kids. In that case, the Ninth Circuit reversed a decision of the district court refusing to return the children because it put a special emphasis on the fact that the parties had a shared intent for the children to be there only for a specific limited period of time, which it affected their ability to acclimatize to that new environment. But the point in Moses was not that it was for a specific limited time. The point was the purpose, which was described as a cultural visit, and Judge Kaczynski made the point not just once but twice in the course of that opinion that if a child spends regularly alternating periods with each parent, he might thus acquire dual, as in sequential, habitual residences or again the opinion referring to a situation where someone consistently splits time more or less evenly between two locations so as to retain alternate habitual residences in each, a concept that we did recognize as comporting with the Hay Convention in Biden. Two points, Your Honor. I think Judge Kaczynski divides up cases into three categories. One of those cases is where there's a shared intent for the child to stay in the new location for a specific period of time, and he says that in those cases, most of the time there's not going to be a change in habitual residence. With respect to alternating habitual residences, I know that they are discussed in the Moses opinion, but that theory or exception was not applied to the facts of that case, which I think are very similar to these. I would just add as well that I don't disagree with opposing counsel that alternating habitual residences don't apply here. May I ask another question? Say we were to, you asked us then to reverse it outright, but the district court did not address certain affirmative defenses that were raised, so in any event, a remand would be necessary to the district court. Is that right? I think at a minimum a remand is necessary because I want to make the point that the affirmative defenses are not before this court. I think the other side made the conscious decision not to raise them as alternative grounds for affirmance. I think that if this court feels it needs to remand, that at a minimum that's the appropriate thing to do. The district court didn't rule on that. That's correct. Thank you. Thank you very much. I'm going to thank both counsel for very well-presented arguments. I would ask that the court room be cleared, and Judge Nygaard, if you'll hold your office, and we'll confirm immediately after the court room is cleared. Thank you. Thank you.